UNITE STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                             )
UNITED STATES OF AMERICA     )
                             )
          v.                 )  CRIMINAL NO. 05-10227-PBS
                             )
WILGEN ANIBAL BRITO-MELO,     )
 RAFAEL HEURTA,              )
          Defendants.        )
_____  )
```

**MEMORANDUM AND ORDER**

September 5, 2006

Saris, U.S.D.J.

## I. **INTRODUCTION**

Defendants Wilgen Anibal Brito-Melo and Rafael Heurta move to suppress evidence seized during a warrantless search of a car and subsequent searches of two apartments pursuant to warrants. At a four-day evidentiary hearing ending on June 15, 2006, DEA Special Agent Mark Tully and State Troopers Kevin O'Neil, Charles F. Kane, Thomas Duane, and Jaime Cepero testified for the government. Rafael Heurta testified for the defendants. This motion raises multiple issues worthy of an end-of-year criminal procedure exam. I **DENY** the motions to suppress the searches, but allow the motion to suppress the statements.

## II. **FINDINGS OF FACT**

### A. **New York City Investigation**

In late 2004 to early 2005 the DEA investigated a drug

1

distribution conspiracy in New York City.  The DEA learned that Yubel Mendez, known as "Oregano," was the head of the conspiracy and lived in the Dominican Republic.  "Buchito" was the head of the New York City branch of the operation.  Buchito repeatedly called a cell phone with the number 617-590-5820 ("the target telephone") during or immediately after drug deals.  The DEA believed defendant Brito-Melo was on the receiving end of those calls and that he was the head of the Boston branch of the drug conspiracy.  He is the common law brother-in-law of Oregano.  A reliable confidential source told the DEA that Brito-Melo was in New York for many of the drug deals, including a failed delivery of sixty kilograms, and that the source had driven to Boston to deliver three to seven kilograms of cocaine to Brito-Melo on several occasions.  The confidential source identified Brito-Melo from an immigration photo and identified his voice after calling the cellphone.  In March 2005, the police learned that Brito-Melo had an outstanding deportation warrant.

## B. Boston Investigation: March - June 2005

Using a wiretap on the target phone, the government began interception of calls on Brito-Melo's cell phone on March 25, 2005.  The government intercepted several conversations that it believed were between suspected drug dealers and customers who were speaking in "code."

For example, on March 31, 2005 Brito-Melo spoke on his phone

to "Pinto," whom the DEA later learned was defendant Heurta.
Pinto told Brito-Melo that he was on an errand to pick up "some
tickets," and that he "saw some cars on Saturday."  The
government believes "tickets" is code for money, and "cars" is
code for drugs.  (Exhibit 2.2)  On April 12, 2005, Pinto called
Brito-Melo and told him that "Paisa" was looking for "work."  The
government believes that in this context, "work" is code for
cocaine.  Pinto went on to ask Brito-Melo what number Pinto
should give to Paisa.  Brito-Melo said one-and-a-half.  Pinto
asked for clarification.  They agreed to give "it" to Paisa at
two; Pinto would keep a half and pass on one-and-a-half to Brito-
Melo.  The government believes that in this conversation, Pinto
negotiated raising the selling price of cocaine ("work" and "it")
from $1,500 ("one-and-a-half") to $2,000 ("two") so that he, and
not just Brito-Melo, could profit from the sale.  (Exhibit 2.6)

Based on an April 16, 2005 wire-tapped telephone
conversation between Pinto and Brito-Melo, the DEA believed the
two were about to meet near the Furnace Brook rotary in Quincy.
During surveillance, Agent O'Neil observed Brito-Melo drive to an
apartment building at 290 Quarry Street.  Brito-Melo then used
the tapped phone to tell Pinto that he had arrived at Pinto's
location.  Agent O'Neil then observed a mustached, heavy-set
Hispanic male believed to be Pinto walk across the parking lot of
290 Quarry Street.  Further investigation revealed that the

lessee of apartment #705 was Angel Rivera.  Angel Rivera and Pinto are two of several names used by defendant, Rafael Heurta.

The DEA learned that Brito-Melo was using a Massachusetts drivers license bearing the name Jose Navarro Concepcion and that he resided at an apartment located at 6123 Avalon Drive in Weymouth, Massachusetts, which he leased under that name. Heurta, using the name Angela Rivera, resided at 42 Whitfield Street, Apt. 20, in Dorchester, Massachusetts.

The lease agreement showed that Heurta also rented garage #9 at the 290 Quarry Street complex.  The police believed that the apartment and garage were a stash house for drugs and money.

On April 23, 2005 Brito-Melo used the tapped cellphone to tell Heurta to go to a gas station and pick up something which the police believed was money.  Seven minutes later, Brito-Melo spoke on his phone to a "Felipe" to give him directions and to orchestrate the exchange by telling him that Heurta, "a fat white guy," would be in a white Taurus.

Agent O'Neil went to the Furnace Brook rotary and observed a white Taurus pull into a Mobil gas station.  A RAV4 (a small SUV) pulled into the gas station and backed in next to the Taurus. Heurta got out of the Taurus, went into the gas station store, and came out with bottles of soda.  Heurta placed the soda in his car, then opened the passenger door of the RAV4.  He took a bag out of the RAV4, placed it in the Taurus, and then had a brief

conversation with the driver of the RAV4.  Both vehicles departed
the gas station.  After following Heurta back to 290 Quarry
Street subsequent to the suspected money pick up, the DEA rented
an apartment in the same 290 Quarry street building in order to
conduct physical surveillance on the suspected stash house.  As
part of the surveillance, on May 5, 2005, the government
installed a pole camera to monitor garage #9.  The camera
revealed that a white Volvo was stored in the garage, and video
footage showed Heurta going in and out of the garage carrying a
bag.

      In early May, an agent installed a GPS device on an
Oldsmobile Intrigue registered to Brito-Melo under the name Jose
Navarro. In a two week period the Oldsmobile traveled to New York
twice.  After two weeks the police learned that the car had been
sold and therefore discontinued the tracking.  Based on the
wiretap, the government believed Brito-Melo made several other
trips to New York City to deal drugs.

      On May 16, 2005, the surveilling agents determined that
Brito-Melo was no longer using the tapped phone.  The wire tap
was therefore cancelled.

      On May 18, 2005, the surveillance team at 290 Quarry Street
observed Heurta enter 290 Quarry Street carrying two bags.
Later, a black Infiniti entered and the driver, a man named
Vasquez, carried a bag inside.  After the driver of the Infiniti

dropped Heurta off at his home (42 Whitfield Street, Dorchester),
a trooper who was not involved with the surveillance was
instructed to stop and search the Infiniti.  The driver, Vasquez,
consented to the search.  The police discovered a hidden
compartment, and a police K-9, certified in the detection of
narcotic odor, made a positive alert.  The "hide" was stuffed
with Bounty dryer sheets, a method used to mask the smell of
narcotics.  However, no drugs were found in the compartment.

The surveillance team at 290 Quarry Street spotted defendant
Heurta coming and going from the apartment building on several
occasions through the month of June.  On July 2, 2005, the DEA
observed Heurta carry a black suitcase to the garage and depart
in the white Volvo.  Heurta returned in the Volvo on July 6,
2005.  The government believed Heurta was using the Volvo to run
drugs and money between Boston and New York, but had no
information as to the Volvo's actual whereabouts during the
weekend.

## C.   <u>Stop of Defendants and Searches of Cars: July 7, 2005</u>

On July 7, 2005, the surveillance camera at 290 Quarry
Street recorded Heurta's arrival in a blue Saab at 6:00 a.m.
Heurta took something out of his garage and drove off in the
Saab.  Around 9:30 p.m., the Saab returned.  Heurta exited the
vehicle and carried into the apartment buidling a dark-colored
bag that appeared to have a weighted rectangular brick-shaped

object.  Upon his return, Heurta no longer had the same bag, but
carried a different baseball-sized bag.  Heurta walked to the
rear of the Saab and opened the hatchback.  The white Ford Taurus
(from the earlier surveillance) pulled into the parking lot and
stopped at the rear of the Saab.  The driver (later identified as
Brito-Melo) slid over into the passenger seat and Heurta brought
a third white bag from the Saab to the Taurus, got into the
driver's seat, and drove away.

Members of the surveillance team, including Trooper O'Neil,
trailed the Taurus.  At approximately 9:40 p.m. Trooper O'Neil
called State Trooper Kane and ordered him to pull over the
Taurus, which he believed was carrying drugs.  Trooper Kane,
though not part of the surveillance team, had a police dog
trained for narcotics detection.

Trooper Kane followed the Taurus onto Route 93 South and
quickly pulled the Taurus over.  He said that he saw the Taurus
travel into the breakdown lane, twice crossing a tire's width
over the solid-white "fog" line.  Heurta disputed this claim.
Trooper Kane concedes that he would have eventually pulled the
Taurus over, regardless of the alleged traffic infraction.

Trooper Kane asked both the driver and the passenger for
their drivers licenses.  The driver falsely identified himself as
Hector Colon and falsely stated he was coming from Boston (when
Kane knew that was not true).  The initial conversation was in

7

English.  The passenger identified himself as Jose Navarro
Concepcion.  Trooper Kane, who had been informed by Trooper
O'Neil that the driver had rented an apartment under the name
Angel Rivera, had reason to believe that at least the driver was
using false identification.  Agent O'Neil told trooper Kane that
he believed the passenger was probably Brito-Melo, using a false
identification as well.  Kane issued the driver a warning for
driving in the breakdown lane.

Trooper Kane called for backup to watch the two individuals
while he searched the Taurus.  At approximately 9:50 p.m.,
Trooper Duane and Trooper McDonald arrived.  Trooper Duane placed
the defendants along the guardrail, about a car's length apart,
and ordered them to put their hands behind their necks.  They
were not in handcuffs. After Heurta verbally and voluntarily
consented to the search, Trooper Kane searched the Taurus without
his dog and found nothing, except a key chain with several keys.
The search lasted for less than fifteen minutes.  (Heurta's claim
that the search lasted fifty minutes is not credible).  Trooper
Kane was then called back to 290 Quarry Street so that his
trained police dog, Riggs, could sniff the blue Saab.  Trooper
Kane left the breakdown lane of Route 93 at approximately 10:05
p.m., about fourteen minutes after Trooper Duane had arrived.
When Kane arrived at 290 Quarry Street less than five minutes
later, the Saab was parked in the private parking lot of the

apartment building, but there was no sign saying that the lot was private or that spaces were reserved.  There was no impediment like a fence or sign to prevent entrance to the lot.  The police dog alerted to the rear of the Saab with his unique "moon walk," a rearward butt wiggle (use your imagination) by which the canine signals an odor of illegal narcotics.  It also alerted to the door of garage #9.

The defendants were detained on the side of Route 93 for up to twenty minutes after Kane left for Quarry Street.  During that period Trooper Duane told defendants that they were not under arrest, but read them their Miranda rights in English from a card.  When asked whether they understood their rights, Heurta nodded and Brito-Melo said yes.  As the wiretap transcripts show, defendants know little English and communicated primarily in Spanish.  The police at 290 Quarry Street contacted trooper Duane and asked him to bring the defendants to 290 Quarry Street.  The police ordered the defendants to get into the locked back seat of two different police cars and drove them separately to 290 Quarry Street, a few minutes away.  The defendants were not free to leave.

It is not clear what happened after defendants were returned to Quarry Street between 10:30 p.m. and 11:00 p.m. when Trooper Cepero arrived.  Likely they were left in the locked cruiser. The exact times of the defendants' departure from Route 93 and

their arrival at 290 Quarry Street are unknown, but at
approximately 11:00-11:15 p.m.  Trooper Cepero was called to 290
Quarry Street so that he could speak in Spanish to the
defendants.  He arrived by 11:30 p.m.  Trooper Cepero did not
Mirandize Heurta.  When he asked Heurta a series of simple
questions, Trooper Cepero noticed unnatural pauses in the
responses, and suspected that he was being lied to.  During this
conversation, O'Neil approached Heurta and Cepero and asked
Heurta to identify the keys on the key chain found in the Taurus.
Heurta identified several of the keys, including the key to the
Saab, but did not identify the keys to the apartment he rented at
290 Quarry Street.

        After five-to-ten minutes of question and answer, Trooper
Cepero asked the defendant to sign a form consenting to the
search of the Saab.  The form was in Spanish, and Trooper Cepero
read the form to the defendant.  The defendant signed the form
consenting to the search.  The defendant was not in handcuffs.
Trooper Cepero then spoke briefly with Brito-Melo.  Brito-Melo
gave his name as Jose Concepcion and said the two were going to
Brockton to fix a boiler.  He recited a version of the night's
events that differed from Heurta's.  He said he had never been to
290 Quarry Street.

        The police searched the Saab, found a hidden compartment in
the rear of the back seat, and discovered one ounce of cocaine

wrapped in tinfoil and a plastic bag.  Also found were birth
certificates and social security cards, including one for "Angel
Rivera," the name Heurta used to lease the apartment and garage.
Both defendants were then arrested and Mirandized in Spanish.
Heurta was arrested for trafficking cocaine.  He also made
additional statements, including a statement that he did not know
the drugs were in the Saab and that the Saab was not his.  Brito-
Melo was arrested for the outstanding deportation warrant.  The
defendants were booked at the police barracks at about 11:43 p.m.

## D.   The Searches of 290 Quarry Street and 6123 Avalon Drive

The key in the Taurus opened the door to Apartment #705 at
290 Quarry Street.  The police successfully applied for a search
warrant for apartment #705, where the police found "approximately
7 kilograms of cocaine; a loaded 9-mm handgun, with an
obliterated serial number; approximately $50,000 in U.S.
Currency; a cocaine press, cocaine cutting agent, a scale, a
grinder, and packaging materials . . . [and] a checkbook from
Citizen's Bank in the name Jose Navarro."  Based on this
information, the police applied for a warrant to search Brito-
Melo's residence: 6123 Avalon Drive.  There is no evidence that
Brito had a reasonable expectation of privacy in either the blue
Saab or Apartment #705 at 290 Quarry Street.  He did, however,
lease the apartment on 6123 Avalon Drive under the name Jose
Navarro.

### III. **DISCUSSION**

### 1. **Reasonable Suspicion for the Stop**

The police had reasonable suspicion to believe that the
defendants were engaged in drug trafficking when they stopped the
Taurus on July 7, 2005 on Route 93. See United States v. Monteiro
447 F.3d 39, 43 (1st Cir. 2006) ("In evaluating whether
reasonable suspicion existed, we look at the totality of the
circumstances of each case to see whether the detaining officer
had a particularized and objective basis for suspecting legal
wrongdoing.") (internal quotation and citation omitted).  "Under
the 'fellow-officer' rule, law enforcement officials cooperating
in an investigation are entitled to rely upon each other's
knowledge of facts when forming the conclusion that a suspect has
committed or is committing a crime."  United States v. Meade, 110
F.3d 190, 193 (1st Cir. 1997).

Based on the investigation beginning in 2004 in New York
City, the police collectively reasonably suspected that Brito-
Melo was engaged in drug trafficking and that Heurta was
associated with him in drug distribution in Boston.  They had
previously witnessed Heurta engage in what they believed was a
money pick up orchestrated by Brito-Melo in the same white Taurus
and had heard him discuss suspected drug deals over the phone.
Just before the police pulled the car over, they saw Heurta, the
driver of the Taurus, leave a suspected stash house, place a bag

12

in the white Taurus, and drive off.

It is therefore not necessary to resolve whether or not the Taurus was engaged in a minor traffic infraction which would independently justify the pullover.  Although the car went over the fog line at least once (twice seems dubious given the span of time), there is no evidence it swerved in a way suggestive of drunk driving or cellphone inattentiveness.  There is also no evidence the minor infraction involving a mini-swerve into the breakdown lane was unsafe in any way.  See Mass. Gen. L. ch. 89, §4A.

## 2. **Duration of the Stop**

The Supreme Court refuses to "adopt a hard-and-fast time limit for a permissible Terry stop."  United States v. Sharpe, 470 U.S. 675, 685 (1985).  When the length of an investigative stop is challenged, the district court must determine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  Id.

Defendants contend that the detention of the defendants for approximately 75 minutes was unreasonable in duration.  This contention must be deconstructed into different time interludes because the picture was evolving.  It was certainly reasonable to detain Heurta and Brito-Melo while Kane searched the Taurus.  The police had reasonable suspicion that Heurta had placed drugs in

the Taurus.  Heurta's use of a false identification when he was
pulled over and his bogus story about his trip escalated the
level of suspicion.  United States v. Lee  317 F.3d 26, 31 (1st
Cir. 2003) (discovering bogus credit cards contributed to
escalated suspicion and continued detention).  The search,
conducted after Heurta consented, lasted no longer than fifteen
minutes and was reasonable in duration.

Likewise, it was reasonable to detain them while Kane and
his K-9 went to Quincy Street to sniff the Saab.  When the search
of the Taurus turned up empty, the Saab became the logical
alternative location for drugs.  After all, the police had
surveilled Heurta putting a ball-shaped object in the hatch of
the Saab.  Sending Trooper Kane and his K-9 was a quick way for
the police to confirm or dispel their reasonable suspicions.
United States v. Perez, 440 F.3d 363, 373-74 (6th Cir. 2006)
(detaining individuals for a total of ninety minutes while a
police dog was brought to sniff a second car at a different
location was reasonable).

Altogether, the defendants were detained forty-five minutes
to an hour until the dog did his butt-wiggle-rearward-moon-walk
to signal drugs were in the Saab.  At that point, reasonable
suspicion escalated again, perhaps morphing into probable cause,
and a continued detention to conduct the search of the Saab was
reasonable.

14

3.  <u>Custody</u>

Defendants argue that the police were required to Mirandize the defendants when they were driven to 290 Quarry Street because they were under de facto arrest.  I agree.  "It is settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) (internal quotation and citation omitted).  Although Terry stops do not normally require Miranda warnings, Terry stops that become custodial, while still not arrests, require Miranda warnings.  <u>See</u> <u>United States v. Trueber</u>, 238 F.3d 79 (1st Cir. 2001) (holding that subjective intent of the agents "has no bearing on determining whether police conduct transformed an investigative stop into a de facto arrest.");  <u>United States v. Acosta</u>, 363 F.3d 1141, 1150 (11th Cir. 2004) (holding that a stop where "a reasonable person in the detainee's position [would] feel he was completely at the mercy of the police," was a legitimate Terry stop, but was the kind of "highly intrusive, 'non-arrest' encounter" that might require Miranda warnings);  <u>United States v. Perdue</u>, 8 F.3d 1455, 1466 (10th Cir. 1993) ("We believe this case presents the precise scenario envisioned by the <u>Berkemer</u> Court when it indicated that Miranda warnings might be implicated in certain highly intrusive, "non-arrest" encounters.");  <u>United States v. Quinn</u>,  815 F.2d 153, 160 (1st

Cir. 1987) (holding that <u>Berkemer</u> might, but does not definitively, require Miranda warnings in custodial Terry stops).

While as a general rule Terry stops do not implicate the requirements of <u>Miranda</u>, a valid investigative stop can escalate into custody.  At the roadside at night, the defendants had their car taken away from them, were placed in locked police cars, and were involuntarily driven separately to a different location and kept in the cruisers.  Men with limited English-speaking ability in their shoes would have understood themselves to be in custody at the time they were locked into cruisers on the roadside after being detained for about forty minutes or more.  At the new location there were approximately ten to twelve officers on the scene, and a canine.  The defendants were therefore in police custody at the point they were placed in the cruisers on the side of the road and driven to 290 Quarry Street.  <u>See</u> <u>United States v. Smith</u>, 3 F.3d 1088, 1098 (7th Cir. 1993) (removing a detainee from the vehicle and his companions and handcuffing him in the presence of a large number of officers constituted "sufficient curtailment of [detainee's] freedom of action to establish custody for Miranda purposes"). While the length of the detention does not automatically transform the Terry stop into a custody, it is an important factor.  <u>See</u> <u>United States v. Place</u>, 462 U.S. 696 (1983) (holding that a 90 minute detention was too long).

Although Trooper Duane gave Miranda warnings to the

16

defendants in English, and defendants know some English, I find
that they did not know enough English to fully understand Miranda
warnings given in English.  They could therefore not make a
knowing and intelligent waiver of their rights after a Miranda
warning in English.  Based on the wiretap transcripts, the police
knew that English was "iffy" at best.  Presumably, that was why
Cepero was called to help out.  The Miranda warnings in Spanish
were not given until after the defendants were formally arrested.
Heurta's statements at 290 Quarry Street that were therefore
given without a voluntary waiver of rights are inadmissible.

   **4.  The Saab Story**

   The search of the Saab is lawful for two straightforward
reasons.  First, Riggs signaled the presence of drugs.  The use
of the police dog to sniff the outside of the Saab was not an
unlawful search.  "[T]he use of a well-trained
narcotics-detection dog . . . generally does not implicate
legitimate privacy interests."  Illinois v. Caballes, 543 U.S.
405, 409 (2005).  Because the Saab was in the apartment's parking
lot, no search or seizure occurred when the police approached it.
United States v. Perez,  440 F.3d 363, 375 (6th Cir. 2006)
("Because the Tahoe sat in the parking lot of the hotel and was
not stopped, detained, or moved, no search or seizure occurred
when the Tahoe was approached."); United States v. Ludwig, 10
F.3d 1523, 1527 (10th Cir. 1993) ("We hold that even such random

and suspicionless dog sniffs are not searches subject to the
Fourth Amendment."). While dogs are not infallible, the alert,
combined with the surveillance and other information available to
the police, supported probable cause.

There was probable cause to justify a warrantless search of
the Saab because Heurta, who associated with a known drug
trafficker, came out of a suspected stash house, placed a
suspicious item in the Saab, and a properly trained and reliable
drug detection dog alerted positively to the presence of drugs.
See Perez, 440 F.3d at 374-75; United States v. Rosborough, 366
F.3d 1145, 1153 (10th Cir. 2004) ("A dog alert creates general
probable cause to search a vehicle."). Once the drugs were
found, there was probable cause to arrest Heurta.

Second, Heurta voluntarily consented to the search of the
Saab. He was read a consent form in Spanish. He then read and
signed the form giving his consent to have the Saab searched.
The police did not need to warn Heurta that he had a
constitutional right to refuse a request to search.
Schneckloth v. Bustamonte, 412 U.S. 218, 229-30 (1973). The
police's failure to give Miranda warnings is therefore not
dispositive. United States v. Rodriguez-Garcia, 983 F.2d 1563
(10th Cir. 1993); United States v. Glenna, 878 F.2d 967, 971 (7th
Cir. 1989) (describing how "every federal circuit court that has
addressed the question" has held that Miranda warnings do not

18

need to be given before asking for a consent to search).  <u>See</u>
<u>United States v. Patane</u>, 542 U.S. 630, 643 (2004) (holding that
Fourth amendment exclusionary rule does not apply to evidence
obtained as a result of unwarned but voluntary statements in
violation of <u>Miranda</u>).

Nevertheless, the consent must be voluntary; it cannot be
implicitly or explicitly coerced. <u>Schneckloth</u>, 412 U.S. at 228.
"The voluntariness of a consent to search turns on an assessment
of the totality of the circumstances. . . . [C]ustody alone has
never been enough in itself to demonstrate coerced consent to
search." <u>United States v. Barnett</u>, 989 F.2d 546, 554 (1st Cir.
1993) (internal quotations and citations omitted).

Heurta consented to the search of the Saab, as he had
earlier to the search of the Taurus.  The form Heurta signed
stated in Spanish that the signatory was neither forced nor
threatened and that his consent was voluntary.  Heurta was not in
handcuffs at the time he was asked for his consent, and he was
standing in an area he was familiar with.  True, there were
approximately a dozen police in the parking lot, but only one was
questioning him.  Heurta was not threatened.  I find that in the
totality of the circumstances, the consent was voluntary.

   5. **<u>Search Warrant</u>**

The searches of apartment #705, 290 Quarry Street and 6123
Avalon Drive were legal and the evidence produced from the

19

searches is admissible.  The warrants include only a brief
mention of the suppressed statements made by Heurta; they recount
Heurta's reasons for being in the area, and why he had parked at
290 Quarry Street.  The affidavit for the warrant to search
apartment #705 relies extensively on the investigation of the
suspected drug conspiracy and the searches of the Saab and the
Taurus.  The affidavit for the search of 6123 Avalon Drive relies
on the same information, as well as the evidence discovered at
290 Quarry Street, apartment #705.  Even if the defendant's
statements in the affidavits are excised, the remaining
information in the affidavits provides probable cause.  See
United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005)
("Thus, when faced with a warrant containing information obtained
pursuant to an illegal search, a reviewing court must excise the
offending information and evaluate whether what remains is
sufficient to establish probable cause.").

   **6.  Standing**

   As the government points out, Brito-Melo has no standing to
object to the search of the blue Saab or apartment #705 because
he has failed to demonstrate a sufficiently close connection to
the car or apartment.  See United States v. Sanchez, 943 F.2d 110
114 (1st Cir. 1991).

   It is a close call as to whether he has standing to
challenge the search of the Taurus.  Generally, passengers do not

have standing to challenge a search of a vehicle.  <u>Rakas v.</u>
<u>Illinois</u>, 439 U.S. 128, 148-49 (1978).  Here, Brito-Melo claims
he had a legitimate expectation of privacy because he had
borrowed the Taurus, and was driving it moments before the search
although he was not driving at the time of the stop.  However, no
drugs were found in the Taurus, although the keys were.  It is
unclear whether the government will seek to introduce the keys
against Brito-Melo, and the issue was hardly a key one at the
hearing.  I will dwell on the issue if needed another day.

      **7.**  <u>**Arrest of Brito-Melo**</u>

      One final issue.  Brito-Melo was arrested based on the
deportation warrant.  As the government notes, it is not clear
that the DEA can make an arrest based on an administrative
deportation warrant.  Remarkably, the parties cite no caselaw on
point, and I could find none.  The issue was barely briefed.  In
any event, the government argues that Brito-Melo could be
detained based on an administrative warrant pending arrival of
immigration authorities to execute the warrant for a reasonable
time. Because this issue was so poorly vetted and seems not to
matter, I need not make a ruling on the lawfulness of Brito-
Melo's arrest based on the deportation warrant.

## **ORDER**

The motions to suppress the fruits of the search of the Saab and the subsequent searches are **DENIED** (See Docket No. 38).  The motion to suppress defendant Heurta's answers in response to Cepero's questions is **ALLOWED**.

**S/PATTI B. SARIS**
United States District Judge